WATSON v. E. E. NAUGLE TIE CO.[1]

1. SALES — ACTION FOR PRICE — PASSING OF TITLE — EVIDENCE — QUESTION FOR JURY.

In an action for the price of certain ties, posts, and poles, involving the issue of the passage of title to the poles and of the surrender or discharge of the contract as to them, evidence examined, and *held*, to present a question for the jury.

2. SAME—EVIDENCE—INTENT OF PARTIES.

Under section 5085, 2 Comp. Laws, the marking of poles with the buyer's log mark is evidence of ownership proper to be considered upon whether it was understood that title should pass notwithstanding an arrangement that the poles were to be inspected afterwards.

[1] Rehearing pending.

3. SAME—PASSING OF TITLE—INTENT OF PARTIES.

Whether title to poles passes to the buyer on delivery at the place provided for in the contract depends upon the intent of the parties as determined from their acts, conduct, and statements.

4. SAME—DELIVERY—NONPAYMENT—REMEDIES.

Where the seller of posts and ties has delivered them at the places designated, and they have been inspected and accepted, the delivery is complete and payment due in the absence of any agreement for credit; and if the buyer does not pay the seller may rescind the contract, and retake the goods, ignoring the title of the buyer, or, if the buyer has taken possession, the seller may recover them in a proper action.

5. SAME—QUESTION FOR JURY.

Evidence examined, and *held*, to present a question for the jury whether the seller did not reclaim the property which the buyer failed to take and pay for.

Error to Chippewa; Steere, J. Submitted April 4, 1907. (Docket No. 7.) Decided July 1, 1907.

Assumpsit by Thomas H. Watson against the E. E. Naugle Tie Company for goods sold and delivered. There was judgment for plaintiff, and defendant brings error. Reversed.

Plaintiff, a resident of Chippewa county, this State, and the defendant, an Illinois corporation, dealing in ties, posts, etc., on January 16, 1903, entered into a contract by which plaintiff agreed to sell and deliver to the defendant 25,000 cedar railway ties, 40,000 five-inch and up eight-foot posts, and 4,000 long posts and poles. Those parts of the contract material to the issues involved are as follows:

"Delivery and Inspection: Party of the first hereby agrees to deliver said material at places in vicinity of DeTour and Drummond Island during the winter of 1902 and 1903, and the entire delivery to be completed by May 10th, 1903, and party of second part agrees to inspect the same from time to time when so delivered, in quantities of not less than one inspection of the whole amount, said

inspection to be final, and upon such inspection and marking of said material by said party of the second part, the same shall become the property of the said party of the second part, and they shall pay therefor in the manner herein provided. Party of the first part agrees to pay for any labor necessary in handling said material for inspection and to deliver said material free from all liens or incumbrances of any kind.

"The party of the second part, after such inspection on the bank, shall not be held responsible for any rejected ties that are not removed before or at time of loading when they have been properly marked as such.

"The party of the second part shall not be liable for any taxes, against such material purchased.

"It is agreed and understood, however, that after such delivery and acceptance, the party of the first part shall put the material so accepted F. O. B. rail of vessels when called for by said second party or their agent and to insure the performance of this condition by party of the first part, party of the second part shall retain 10 per cent. of the purchase price until all of said material is so properly placed, and in case, for any cause whatsoever, the said material, or any part thereof, shall not be placed as aforesaid, party of the second part shall retain the said 10 per cent. of the purchase price to apply on their damages by reason of such failure. *   *   *

"Advances and Terms of Payment: Two thousand five hundred dollars now paid, and one payment based on estimates on or about the 15th of March, balance when final inspection is made on or about May 10th, less 10 per cent.

"Final shipments to be made no later than August 15th, and any moneys advanced to said first party shall become a lien on all material intended under this contract, and the same to be deducted from the proceeds of first material delivered, and all such advances shall draw interest at the rate of seven per cent. per annum from date actually made until date repaid by shipment of such material."

Plaintiff's declaration is in assumpsit upon the common counts for goods sold and delivered. A bill of particulars was furnished. The theory of the plaintiff is that he had fully performed the contract, had delivered the goods as specified in it, that they had been accepted by the defendant, and that the contract was fully executed. The defendant's theory as to the poles is that the contract had

not been fully performed, and that the title to them had not vested in the defendant.

Plaintiff purchased the timber from various parties, among whom were one McInnes and one Demorest. The timber purchased from these parties is that in dispute. It was conceded that the defendant owed the plaintiff on other timber $672.35, unless a small item of $27 should be allowed as payment. Demorest and McInnes delivered the ties, posts, and poles at the places provided for in the contract. One Jacobi was the manager, agent, and inspector of the defendant. Mr. Jacobi inspected them as provided in the contract, except the Demorest poles.

Defendant contends that, even though there was no delivery and acceptance of the ties and posts before the institution of this suit, plaintiff had discharged the contract as to them by his own acts, admissions, and conduct, and that the testimony conclusively establishes that fact. All the posts, ties, and poles in dispute were at such inspection marked with the defendant's log mark: "E. N. E." The defendant did not furnish vessels for the transportation of the timber in dispute either during the term provided for in the contract or afterwards. McInnes disputed the accuracy of Jacobi's inspection, and declined to be bound by it. The Demorest poles were not piled in a way to make a practical inspection. On the certificate of inspection of the McInnes poles Jacobi wrote: "Null and void." The evidence on the part of the plaintiff showed that it was agreed that the McInnes poles should be again inspected when loaded, and that Jacobi said: "He stamped the timber, and they claimed the timber." Jacobi testified:

"The [McInnes] poles were objected to on account of a discrepancy in the number of pieces that he claimed over and above that which we found, and the matter remained understood between us that, when we shipped the stuff, we would have a recount on that, and, if I found it, then I would credit him with it."

Plaintiff also gave evidence tending to show that the Demorest poles would be inspected when they were loaded. The court directed a verdict for the plaintiff for the posts and ties. As to the poles the court instructed the jury as follows:

" You are therefore instructed that as to those poles, as the matter stood at that time, it cannot be said, under the contract relating to them, that they were both inspected and marked according to the contract. That leaves for your consideration in relation to those poles the testimony as to what subsequently occurred. On the part of Mr. Watson, it is claimed that he had asserted a claim that the poles had, with the other timber there, been inspected and accepted, that they should take them and pay for them. It is claimed in his behalf that he made that demand of them at the time he met in 'counsel with the representatives of the defendant to go over their accounts and balance and settle them, and that they, at that time, acknowledged his claim, recognized this timber as purchased by them, and agreed to take the same. On the part of the defense, it is claimed that Mr. Watson, in the first instance, and for a long time, recognized these poles had not been fully inspected and marked according to the contract; that he made no claim that they should pay for them or take them; that he wrote them to that effect; that he afterwards negotiated and sold them to others, or attempted to sell them; that he at different times made a claim of ownership upon them and in relation to them; that he approached them with a request that they release the mark which had been put upon them; and that they complied with his request, and did everything that he requested, and offered to do anything further that he desired, and therefore the matter was settled and disposed of, irrespective of the previous acts of the parties, by a contract and agreement upon which their minds met."

The jury found for the plaintiff.

*Oren, Webster & Carleton*, for appellant.

*Davidson & Hudson*, for appellee.

GRANT, J. (*after stating the facts*). 1. The ques-

tions of the passage of title to the poles and of the surrender or discharge of the contract as to them were properly submitted to the jury. Whether title to the poles had passed depends upon the intent of the parties. The marking of the poles with defendant's log mark was evidence of ownership. 2 Comp. Laws, § 5085. Was it understood by them that the title should pass, notwithstanding the arrangement that the poles were to be inspected afterwards? That intent was a fact to be determined from the acts, conduct, and statements of the parties. Upon this point there was a clear conflict of evidence. The same is true of the other question involving the surrender or discharge of the contract as to the poles.

2. The learned circuit judge correctly instructed the jury that the plaintiff had fully performed the contract as to the posts and ties. He had delivered them at the places designated. They had been inspected and accepted. The delivery was complete. Payment was then due. The defendant did not pay. Under these circumstances, the plaintiff could have rescinded the contract, retaken the goods, and ignored the title of the defendant. If he had failed to pay upon delivery and had taken possession of the goods without payment, the plaintiff could have recovered them in a proper action. 24 Am. & Eng. Enc. Law (2d Ed.), p. 1135; 2 Mechem on Sales, § 1682.

This claim of defendant was not mentioned by the circuit judge in his charge. Was there evidence to sustain it? Mr. Wilson, an agent for the defendant, testified that in a conversation with plaintiff, plaintiff told him that the timber was worth more than it was the year before, and that "the defendant had lost any supposed rights that it might have had to take it away, and couldn't have it." In another conversation the same witness testified that plaintiff "either wanted us to go there and take the timber on the terms which I have stated, or else to release the timber from the mark. He thought it should be released if there was anything in the mark that prevented him from selling the timber." Plaintiff had had negotiations

with one Gilpin to purchase the timber, but Gilpin hesitated on account of the defendant's mark upon it.    Mr. Wilson testified that he saw Mr. Gilpin and told him he could purchase it, and he would release it to Mr. Watson, that he subsequently saw Mr. Watson and told him specifically what he had done, and that plaintiff said it was satisfactory.

"I asked him if he wanted a written release from me, or if he wanted me to send to the Naugle Tie Company and get a written release.    He said it was not necessary; that if I had been there and released the timber to Mr. Gilpin, and would now release it to him, that was sufficient."

Another witness, Mr. Dean, who was sent by the defendant to see if there was any timber there, testified that plaintiff said to him:

"There is no use of your going over to the island, because all the timber was shipped, and there was none there."

In a letter of January 7, 1904, plaintiff wrote defendant, demanding payment for the timber taken, and in that letter wrote:

"I have waited and done without my money now for a year and now must insist on a settlement in full.    If not, I shall proceed at once to enter suit.    As for your Mr. Dean not going over to the island to count up, that does not annoy me, as the timber is worth the money where it is.    I care nothing about what you did not take.    It is what you have got I want pay for."

This letter was in reply to one from defendant of December 29, 1903, in which defendant wrote:

"If it is true that the material cannot be inspected and tallied now, the only way that I know to handle the posts and poles that are still on the island would be to make a new contract for a specified amount of poles of certain lengths and sizes, to be delivered the first thing in the spring and to make such payment on them as we might mutually agree upon.    This, however, is only a suggestion, and I should be glad to hear from you upon it."

This evidence certainly tended to sustain the defendant's theory. The evidence upon this branch of the case was the same in case of the posts and ties that it was in case of the poles. If it was proper to leave the question to the jury in the one case, it was also in the other.

We think there was a conflict of evidence, and are therefore compelled to reverse the judgment, and order a new trial.

BLAIR, MONTGOMERY, HOOKER, and MOORE, JJ., concurred.