Argued November 18, 1936; reversed January 19, 1937

# GARLAND ET UX. *v.* SHRIER ET UX.

(64 P. (2d) 530)

Department 2.

B. G. *Skulason,* of Portland (Skulason & Skulason, of Portland, on the brief), for appellants.

*Francis E. Marsh,* of McMinnville (Vinton, Marsh & Marsh, of McMinnville, on the brief), for respondents.

RAND, J. This is a suit in equity for the rescission and cancellation of a written contract for the exchange between plaintiffs and the defendants of certain real and personal property, and for the restoration by each of the property received.

The contract was entered into by the plaintiffs and the defendants in November, 1934, and, by its terms, it obligated the plaintiffs to transfer and convey to the defendants block 31 in the town of Lafayette and a dwelling house in exchange for the northeast quarter of the southeast quarter of section 12 in township 7 north of range 1 west of the Willamette meridian, in Cowlitz county, Washington, which the defendants contracted to convey to the plaintiffs by a warranty deed and subject to a mortgage of $500 owing to the Federal Land Bank of Spokane, Washington.

In addition thereto, the contract provided that the plaintiffs should transfer to the defendants a certain span of horses and harness of the agreed value of $300 and that, in payment therefor and for the agreed difference in the value of the properties exchanged, the defendants should pay to the plaintiffs the sum of $250 in cows and heifers at the agreed price of $35 per head and should also pay to the plaintiffs the sum of $300 in other cows and heifers at the agreed price of $35 per head. The contract also contained other provisions not material to this controversy.

Prior to the making of the contract, the defendant Fred Shrier, who was living at or in the vicinity of Kelso, Washington, while on a visit with some relatives near Lafayette, after becoming acquainted with the plaintiffs and learning that the plaintiffs were interested in cattle raising, proposed to them an exchange of said real property and stated that the 40-acre tract of land near Kelso was suitable for cattle raising and was surrounded by a good open range, and asked the plaintiffs to make an inspection of the 40-acre tract.

Shortly thereafter, the plaintiffs went to Kelso and inspected defendants' said premises and, while there, the defendant Fred Shrier pointed out to the plaintiffs a certain rail fence and stated to them that it was the west boundary line of said 40-acre tract and thereupon the contract sought to be cancelled herein was entered into and immediately thereafter the plaintiffs turned over to the defendants the said span of horses and harness and received from the defendants certain cows and heifers in payment of the difference in the value of the properties contracted to be exchanged and in payment of the team and harness, but no deeds for the real property were delivered.

Thereafter, the plaintiffs, for some reason not disclosed by the evidence, became suspicious as to whether the defendants had pointed out the true west boundary of the 40-acre tract and insisted that a survey be made. Thereupon the defendants employed a surveyor to survey out the boundaries of said 40-acre tract and it was found from his survey that the west boundary of the 40-acre tract was not on the line of said fence but was some three hundred feet east therefrom and that there was a strip of some three hundred feet between the true line and the fence on which about one-half of the tillable land claimed by the defendant was situate and that a valuable spring and most of the buildings were located on said strip and were not within the boundaries of the 40-acre tract.

Upon discovery of the mistake, plaintiffs immediately notified the defendants that they rescinded the contract and offered to return the cattle which they had received and demanded that the defendants should return to them the span of horses and harness. This the defendants refused to do and thereafter they tendered to the plaintiffs a deed for the 40-acre tract, describing it not by metes and bounds but by legal subdivisions and, as so described, the deed did not include or purport to convey any part of the 300-foot strip. The plaintiffs refused to accept said deed and immediately thereafter, and without the knowledge or consent of the plaintiffs, the defendants took possession of said block 31 and the dwelling house thereon in Lafayette and have ever since remained in possession thereof through a tenant who has been paying to the defendants as rental therefor the sum of $10 per month. In their answer, the defendants pray for a decree requiring the plaintiffs to convey said block of land to them and that, upon their failure to make such conveyance, a decree be entered which

will operate and stand in lieu of a deed for said premises.

Upon the trial of the cause in the court below and upon proof of the facts above stated, the court entered a decree denying any relief to the plaintiffs and decreeing that the plaintiffs should accept the deed tendered by the defendants for the 40-acre tract and that the decree should stand as a deed conveying the Lafayette property to the defendants. From this decree, the plaintiffs have appealed.

■■ It is a rule generally applicable to contracts that, in the absence of an option reserved in the contract granting to one of the contracting parties the right to rescind, the contract cannot be abrogated or abandoned by either party without the consent of the other. But where one party has been induced by fraudulent misrepresentations or by mistake of a material fact to enter into a contract which, but for such misrepresentations or mistake, he would not have entered into, he may rescind the contract without the consent of the other upon giving notice thereof and returning or offering to return what he has received under it. In such case, the fraud or mistake affords to the injured party a sufficient cause in law to entitle him to abrogate or rescind the contract without obtaining the consent of the other contracting party.

■ In the instant case, when the plaintiffs entered into this contract they supposed, and had every reason to suppose, that, upon carrying out their part of the contract, they would acquire title to the land pointed out to them by the defendants and when, after signing the contract, they ascertained that the lands which they would acquire did not include a large portion of the tillable lands, the spring and most of the buildings for which they had bargained and had been assured by the

defendants they would obtain, they were entitled to rescind the contract and, upon giving notice thereof and offering to return what they had received under the contract, they were no longer bound by it and it was the duty of the defendants to restore to them what they had parted with. This is so regardless of whether the misrepresentations made by the defendants to them were innocently or fraudulently made, for in either case the plaintiffs were acting, without any fault upon their part, under a mistake of fact. As said in 3 Black on Rescission and Cancellation, (2d Ed.), section 560:

"If one party to a contract furnishes a legal ground for its rescission, either by his fraudulent conduct at the inception of the contract or by his subsequent default, his assent to a rescission declared by the other party is not necessary. But a rescission declared or demanded without any legal cause at all may be assented to or acquiesced in by the other party, and when this is done, the contract is as effectually abrogated as if it had been set aside by a decree of court. One or other of these elements must, however, be present. Either there must be good ground in law for rescinding the contract or else there must be consent given by the opposite party."

Again, the same author says in section 558:

"One who has bound himself by a contract cannot relieve himself from its obligations, against the will of the other party, unless he is able to impeach the contract and claim a release from it by showing circumstances recognized at law or in equity as proper grounds for setting it aside. Without the existence of such grounds, a repudiation or attempted rescission of the contract is no more than a breach of it, and will not preclude the other party from proceeding with the performance of his part of the contract."

■ At the time when the plaintiffs rescinded the contract and notified the defendants of such rescission, the

contract was executory upon the part of both the contracting parties. No deeds of conveyance had been executed by either party. Nothing had passed from one to the other except the span of horses and harness to the defendants and a few head of cows and heifers to the plaintiffs, and these cows and heifers were on the range adjacent to the 40-acre tract where they had been placed by the defendants. They, therefore, were not in the actual possession of the plaintiffs but were in the constructive possession of their true owner and required no actual delivery to be made by the plaintiffs. There was, therefore, nothing to prevent the plaintiffs and the defendants from being placed in *status quo.*

█ The defendants, however, offered some evidence tending to show that the line fence which they had represented to the plaintiffs as constituting the west boundary of the 40-acre tract had been established as the true line by the former owners of the adjoining premises and had been maintained for more than ten years prior to the making of the contract and this acquiescence and consent during all said time by the coterminous owners of these premises, the defendants contend, conferred title upon them to the 300-foot strip by prescription or adverse user.

The rules applicable to the recognition and acquiescence resulting from the construction and maintenance of a fence by the two owners of coterminous real property, where the true line is unknown and there is a well-grounded dispute, depend so much upon the particular facts of each case that it is impossible to say from the testimony offered in this case whether the defendants owned the strip or not. The owner of the adjoining property was not a party to the suit and he was not a witness in the case and what his contention

may be in respect to that matter is purely a matter of conjecture.

█ It is clear from the testimony offered that plaintiffs believed, when making the contract, that they would get a merchantable title to the 300-foot strip and the contract was not entered into by the plaintiffs for the purpose of purchasing a lawsuit. They had a right to demand a warranty deed for the particular land which the defendants pointed out to them and to be furnished with an abstract showing a merchantable title to the entire tract. The evidence shows that subsequent to the rescission by the plaintiffs of this contract the defendants tendered to the plaintiffs and plaintiffs refused to accept a deed which described the lands intended to be conveyed by legal subdivisions only and not by metes and bounds. Had this deed been accepted by the plaintiffs, even if the defendants should be the owners of the 300-foot strip, it would not pass to the plaintiffs, either under the particular wording of the contract or under the particular wording of the deed but would remain the property of the defendants.

For these reasons, it was error for the circuit court to refuse to cancel the contract and to deny to the plaintiffs the relief prayed for in their complaint. The decree, therefore, will be reversed and the cause will be remanded for such further proceedings as may be necessary to restore to the parties to the contract the property they parted with and for such further proceedings in the adjustment of their rights as are not inconsistent herewith, costs in this court to be awarded to the plaintiffs.

BEAN, C. J., and BAILEY and KELLY, JJ., concur.